Our second case is 22-4536, United States v. Everett. Mr. Son, whenever you're ready. Thank you, Your Honor. I'm Paul Son. I represent Reshod Everett. The police conducted a warrantless search of a home where they believe Mr. Everett resided. And then they used the information that they got from that warrantless search in an affidavit to support a search warrant that they used then to search the home. That warrantless search under applicable law is presumptively unreasonable. What's the difference between a warrantless search and a protected sweep? A protected sweep is a permissible exception to the warrant requirement. So, if you don't have a warrant, it's a warrantless search. But you can have an exception to the warrant requirement. There are other exceptions, but the one that the district court law principally is. A permissible protected sweep. So it's still a search, it's still a warrantless search, but it's an exception to the warrant requirement. What are the limitations of a warrantless search? The limitations are there have to be a reason to believe that there are specific articulable facts and rational inferences drawn from those specific articulable facts that reasonably warrant the police in believing that the area to be swept harbors an individual who's a threat. So you have to have these specific articulable facts that justify a reasonable warranted belief that there is someone else there, a threat, in the area that's to be swept. And in this case, the area to be swept was the upstairs of the home. They didn't ever go sweep the downstairs? They did. They swept the house? They could see part of the downstairs? By my count, and this is in Exhibit 2, one of the videos, by my count, there were at least nine officers downstairs. But the testimony from Officer Glenn was that they didn't actually... They looked through there in three and a half minutes, and then they went to get a warrant, a gun search warrant, and during that period of time between the sweep and the warrant, they secured the whole place. They kept everything in place. I agree with that, Your Honor. Which was, you know, that's the normal procedure for police officers, isn't it? If they have reason to seek a search warrant, they can hold it in place. I agree with that, Your Honor. Okay. Now, you're only at three and a half minutes. Yes, and that's the upstairs. But you have to put it in perspective, don't you? What happened the day before over at the Addison Place, whatever it's called, Addison Ridge Apartments, where they found their client's... They searched their client's apartment and found drugs, a gun, and other evidence, including his car registration or something, with the Ronald Reagan house address on it, and they confirmed it with records of the Public Service Commission. They lived there on Ronald Reagan? Yes, sir, Your Honor. But there have to be... They did it, and they should have gone and got a search warrant right then, or the house, on Ronald Reagan. They had probable cause the day before to search the house on Ronald Reagan, but they included all that information on the warrant application on Ronald Reagan. They included all that information from the Addison? They did. But why did they do that? Because they got a search warrant for that before they went in there. You don't challenge that? No, that was not challenged, Your Honor. You're not challenging some of the counts of the indictment, which he was convicted and sentenced, of going to what happened the day before, first week? Correct. You're not challenging those convictions and sentences? I challenge them on the basis of the sufficiency of the evidence, but not based on... On the sufficiency of the evidence. Okay, so that's three counts, or four counts? Two counts. Two counts. Four and five. He was convicted of six counts. He was convicted on count one, conspiracy. Counts four and five, that relates to the apartment five. And then six, seven, and eight, all of those arise from 108 on Ronald Reagan Drive. So he was convicted on six counts. Yes. What do you say the officer should have done? He should have gotten a search warrant. But did they? I mean, Judge King just kind of recounted the evidence that led up to their arrival at this house, and as I understand the evidence, in this case, when they arrived there, they were surprised to find somebody they didn't expect in the home. And so, and I understand that the officer said it's routine policy for us to do protective sweeps every time we enter a house. But the question is whether or not it was appropriate in this case, given what they knew beforehand, the evidence that Judge King recounted, and what they saw when they got there. What was it about, I mean, what was lacking that suggested that they should have done a protective sweep? What's lacking is the kind of specific and articulable facts that are present in every one of the other cases that the government cites, that we cited, and that have to exist under the Maryland Legal Aid standard. I'll address the fact that when the police arrived, Ms. Tickler is there. She's inside the home. And they don't know that she's there. That's the person that they didn't know was in there at all. Right. And they had the house under surveillance for six straight hours. They had the house under surveillance since 1 o'clock in the afternoon. When the arrests weren't in their hands. Correct. And they wanted to arrest him, but they knew Hawkins was in the house. They saw him in the backyard. Saw him in the backyard. Right. So, but with regard to Ms. Tickler. Maybe the truck was parked in the backyard. It was. With regard to Ms. Tickler, what the police found out is that she worked at the daycare. And the reason they didn't see her entering after 1 o'clock is she's already there. When did they find that out? When they go in the house. That's how they found her there. They didn't know why she was there. They found out from asking when they get in. There's Ms. Everett. There's Ms. Tickler. And there's the Everett's kids. And they find out that Ms. Tickler is an employee of the daycare. That explains why they don't see her going. But this daycare is masquerading as a drug stash house. So the fact that she might be working there doesn't mean that she would have been part of the illegal enterprise. And how would they know that there were not other so-called employees in the house? How would they not know that there were not other? Yeah. Given that they found one. They did find one. Then they went upstairs to see who else was there. They did. And we call this thing a protective suite. And protecting has to mean something. Who are they trying to protect? They're trying to protect the officers. They're trying to protect themselves. They're trying to protect the occupants of the house. They're trying to protect people who may be upstairs. And if they don't go up there, they're not going to shoot them. And the police won't have to shoot them. And they're trying to protect anybody else that might be involved, including the arrestee. Agreed. That's why we call it a protective suite. If I could just add one other point about this case. The judge never heard the testimony here about all this. And he found that the officer testimony was credible. But we have to accept that proposition, right? Agreed. You have to convince us that somehow the heir didn't come in. Even after that. Because it's in absence of articulable facts. But with regard to the other fact that is observed before they actually enter the house, is that Ms. Everett comes back to the house. So they have to know that somebody's there who's taking care of the kids. So they didn't know, at reason to know, that there was somebody inside. They found out upon getting into the house. Yes, Ms. Sieck was here. Ms. Everett's here. Ms. Sieck was downstairs. She wasn't downstairs. They didn't know who, if anybody, was upstairs. And there were no facts to suggest that there was somebody upstairs. And so, Chief Judge, you asked, what are we missing here? What we're missing here are the kind of facts that exist. And they knew that, well, Dr. Sleuth was there on the court, I guess. Drug transactions and guns were gathered. And the apartment that this fellow was renting, that they searched the day before, they found some kind of crazy weapon in there, a rod weapon, a handgun. And they made it into an assault weapon or something, with drugs. And it was rationed to this fellow. That's the defendant here. There isn't any case. Right. Yes. Yes. There isn't any case. The government hasn't cited any. You haven't found any. Now, give them a reason to sweep. No, Your Honor, because they saw guns. Yes. That's fair. Yes. A total of what, four assault weapons? Four handguns? When they do the full search, they find, they see two. But they saw some. They see two. But in the sweep, they saw some. They saw two. And the fact that you're protecting the sweep doesn't mean that you can't use what you see in the protective sweep. If the sweep is legitimate, then what they see is legitimately supportive of whatever else they did. I agree. Okay. And there were guns and drugs there, in the house. He played me. During the defense, there is no case. The government hasn't cited any. We haven't found any. That establishes, as a general proposition for the specific articulable facts, that if you're involved in drug trafficking, that's enough to do a protective sweep. No case says that. Because that's not the kind of specific articulable facts that the courts have said consistently have to be there. So, for example, what are the kind of facts that are missing here? Is there somebody that's unaccounted for? We've seen somebody go in. We don't know where they are. They might still be there. That's the Jones case. I think that's your case, Jones, where there was a fugitive who was supposedly at the house. They didn't know. Well, maybe he's still there. That's also the Houck case, which is cited by the government. This is a drug trafficking ring, right? There are a number of folks. And I know that of all the other people, apparently, there's nothing else to do about it. And they're arrested. So I guess your point is they've got to count everybody. But haven't they known that there might not be others involved? Well, the lack of information, and again, this is James' decision in Jones, the lack of information doesn't provide the kind of specific articulable fact that you can use to base a protective suit upon. Again, Your Honor, we've looked. The government doesn't try to argue this. They haven't cited any case. There's a general proposition if you're involved in a drug trafficking conspiracy, that's enough. And the cases don't talk about that because that's not enough. So do I understand you as having answered Judge King's earlier question that there was, they could have sought a warrant earlier. There was enough evidence before this protective suit in which they could have sought a warrant. That goes to one of the alternative. So, yes, Your Honor, that goes to one of the alternative bases for the district court's opinion. But I want to ask the follow-up question then. Are you saying, does that lead to the conclusion, there's no doubt, that these officers would have sought this warrant without the suit? No. And that's the independent source. So you've got to, and the government has to make two shots in order to establish the independent source. And here the search warrant is the independent source. I don't understand the answer to no and what the no means. No, they would not have. No, the government did not prove that the officers would have sought a search warrant but for the teen devils. And that's the first point that they have to show to get an independent source. First of all, would they have sought it or could they have sought it? Would they? The government has to prove that they would have sought that even without the untainted evidence. It's the government's burden. That's what Murray says, the government's burden. And so what would you look at? If I said they could have because the evidence was there, it wouldn't make any sense for a legitimate prosecutor or a legitimate investigator not to search or not to get the search warrant. And knowing that they did it, I mean, very well, I don't know what they did what, but it was funny that from what happened the day before and knowing what they learned the day before that this is his home, they're searching his home. Knowing the business that he was in, that they stood up and all the evidence that they had from the cooperating conspirators that were involved with him, and guns and drugs made everything dangerous in these situations. And they didn't. They didn't. You know, first of all, if they let anybody in a restaurant, and they went to execute the restaurant, that's when all this happened. And then you're challenged, and I respect you for your good work. I've seen you in here several times. It's a protective suite that we're talking about. That's the first one, too. You're hanging your hat on the protective suite being flawed. Constitutionally flawed. I do have to win that, and then I have to win the alternative basis, too, and that's where you get it. The judge never got called up. He didn't. Oh, okay. And I'll come back and address this for you. Unless you've got time, you need to take your time. And I think we should wait and see if the judge will beat us. Thank you for taking the time. We'll hear from the government. Good morning, Your Honor. Ben Keith, the court. I'm here to sit on behalf of the United States. Officers here have articulable facts that would have led a reasonable officer to believe that there were dangerous persons in the house. Officers knew that Everett was part of a large-scale drug trafficking organization. They had multiple members, both of whom had been found armed. They had found a pretty serious gun in Everett's stash house. They knew that he might be part of this while at his house. Officers had seen security cameras from the outside of the home and believed that this could mean that there were people outside watching the live video feed. Then again, officers entered the house, and they found something on the floor. So you have this surveillance that's going on. They then enter the house and have officers assault. They see this extra lady seen within there who ostensibly is a daycare worker, and then they proceed to search the next four women who were protected of the place. Correct. And in the process of it, they believe they are doing it, or at least they're saying to try to see if someone else is in the house. But our case law is pretty specific. Your opponents pointed out that the lack of knowledge is not a basis upon which they conduct a detective suite. The officers here didn't just say, we didn't know who was inside. They said, we knew that there was at least one person inside that we weren't aware of. And they had been surveilling the house, as your Honor mentioned, for six hours. And so they knew that if there was someone there who we didn't know, there could be others there, especially considering that that was part of this large-scale organization, and that all of his confederates had so far been pretty heavily armed. If I can clarify something for me. It's understood they were looking for Cates, and he was in the back of the house. Is that correct? Or had they seen him back or in the house, so they didn't know? Mr. Everett. Mr. Everett, I'm sorry. No, no, no. Okay. They had seen him in the backyard, but when they went to, they knocked on the door to arrest him. And he answered the door. So they arrested him sort of by the front door, inside the house. And so I'll quickly point out, as your Honor mentioned, at this point in 7-4, cases like Watson, when officers are investigating drug and gun cases, those are especially dangerous investigations, and they should be especially alerted to dangers. So especially when seen in the lighthouse, they report to the government. Officers, you've had enough facts to support them. Excuse me. Could they have gotten the warrant before this particular search? They could have. But why didn't they? It's not clear from the record. They don't say it. What it is in the record is that they arrested Mr. Davis the day before, at the apartment's back house. And we know that he met Mr. Gilbert, correct? Correct. So it's one of them, yes. The one you're referring to, but probably they didn't get a search warrant. Also, so when they say they didn't get a warrant, they got an arrest warrant for Mr. Everett. They don't have a search warrant. Correct. But I'm saying they could have gotten a search warrant. Yes, they could have. They had enough information at that point, which is not going to be made in our independent source. But your colleague on the other side says they could have, but they didn't have the evidence to show that they would have. They could have. And so the question there is objective. But how do we know that? Well, this part has said that this report did not make an express finding on that point when the defendant doesn't contest it and the facts are clear that they would have. That's what happened here. Mr. Everett did contest below that officers would not have sought a search warrant. And Mr. Everett's arrest came at the tail end of a multi-month investigation where they had arrested a number of his co-consecutors and found multiple pounds and kilograms of drugs and had found firearms. Officers had determined that Everett was either a leader or the leader of this organization. And so it seems inconceivable that he wouldn't have searched his home, especially as this report has said in Grossman, for example, that whenever there's reason to believe that some of the drugs were on their home, there's reason to believe that they had evidence of that firearm on their home. And that takes you back to the question, well, why didn't they get a search warrant? So, I mean, it's not like they're saying that when they got their arrest report, why didn't they get a search warrant? It's not clear from the record. What I was saying was that in the record is that after Davis was arrested, he made some phone calls from jail where he told people to let Everett know he had been arrested. And so it's possible that officers thought he was going to have to arrest him soon before he distorts evidence or flees. But again, that's not entirely clear from the record. What time did they get the arrest warrant? The 17th or the 16th? The 16th was when they made the search and absolution. Correct. The 17th they made the search. Okay. Reading? Correct. I think it was that day. Let me check. Did you think it was? Because we didn't know what it was. They got their search warrant. The arrest warrant. Arrest warrant. Arrest warrant was on, one second, sorry to interrupt. I can't seem to find it, unfortunately. Okay. But it was either the 16th or the 17th. I believe it was the 17th. I apologize, but I didn't have a hand. But again, officers went to the house. They confirmed that they were there. They saw the house. They said it was suspicious. The house was suspicious because it had a security system. Correct. Grounded. Because it had a high fence. Yeah. Because the truck parked in the backyard. Correct. Those kinds of things indicated it was a big drug business. So, look at that and say, well, that doesn't make sense. We'll get to look at this in context. In the context that the day before, they had found his stash house and found drugs and guns there. They had statements from residents of the apartment that Everett often carried duffel bags from his car to the apartment, and that his car and the apartment both smelled heavily of marijuana. They had an informant who said that Everett is a big-time drug dealer in the city. He sells e-drugs. He sells drugs to other people. So, officers knew that Everett was a big drug dealer already. And so, when seen in that light, the evidence at his home showed that, you know, confirmed what they already knew, which was that he would be able to look at the security system and all that, the tall fence, all that context of what they already knew. Exactly. Yes, Your Honor. And so, especially knowing all of that, and knowing that this is consistent with drug trafficking, officers clearly have a reason to believe that Everett was trafficking drugs and using his house as part of that, whether it be evidence of drug trafficking in the house. Correct, Your Honor. But your brief, you go through all these alternatives. It's true. If you're stopped at juvenile, then you've got three more other things out there. Yes. So, we've made contrary arguments. The second is, you know, first off, we've been discussing the second prong of it a little bit. The first prong here is satisfied as well. The question is, when you excise the evidence of the unlawful speaking from the affidavit, does the affidavit still provide a probable cause? I think, maybe I misheard, but I think my friend on the other side conceded that it does. And even if he didn't concede that, I think the evidence clearly shows that it does. Officers that knew Everett were a large-scale drug dealer, knew he had a stash of drugs. They had a form saying that he was selling drugs. His house had security cameras and his car parked in the back yard, which is evidence of drug dealing. Pension support has said whenever there's a reason to believe that someone is a drug dealer, whenever there's a reason to believe that there's evidence of that crime in the home, you're claiming that they are. As of the 16th, when they left Patterson Bridge, they had a probable cause. The crime of service in place was written. So, at the time they did the protecting sweep, they actually had a probable cause. They just hadn't written it down in the best, or the source of the best evidence. Well, that was the first round of the independent source movement. No officers testified to the fact that they would have gotten a warrant without the sweep. You did not hear that in the district court either. So, this court said in Hill, a district court need not make that determination when it's not contested below, and it's clear from the facts. And as I mentioned earlier, Everett didn't contest this below. I think the reason is that it's pretty obvious from the facts here that officers wouldn't have sought a search warrant, regardless of the protective sweep. But Detective Harden testified. He testified in words to the fact that he said, I believe the sweep was where they established the probable cause of the search warrant. Why is that not the basis above which it would require a district court at least to make some findings about it? So, there's two reasons why it's not helpful here. The first is the legal reason, which is, this court will not consider evidence that due to that trial to reverse a suppression motion unless the defendant renews that motion at trial. That's what Detective said, that it's a trial. Correct, that was not part of the evidence that we presented to the judge there. Correct. After the suppression hearing. Yeah, after the suppression hearing. So, that would not be presented to him when he made his decision, and evidence presented at trial is not considered by a district court in that sense, or by this court, unless the defendant renews his suppression motion, which I heard did not do here. But even if this court were to consider it, which it shouldn't, but even if it were, Detective Harden didn't actually know. He said, I believe, but he wasn't sure. And that's because he was not part of the team who arrested Everett. He was not part of the team that swept the house. He was not part of the team who decided to seek the warrant, nor was he the warrant advocate. So, if the district court did not make the findings of fact here, would you say we should have used it to some extent here? But does it already, in the Springfield case, counsel us to send this back for the district court to make the findings of fact that at least it would get to the independent social problem? So, it does, Your Honor. For two reasons. The first is, like I said, this court has said the district court need not make this finding if it's clear from the record and uncontested. And Murray supports that. Murray said, we're going to remand here for the second, the Murray test, because the facts and the evidence that they're from don't allow us to justify the conclusion that officers would have searched, or would have sought a search warrant anyway. So, Murray himself said, we're only doing this because the facts here don't show clearly that officers would have done that. So, here the facts are much more clear. Here it's uncontested. So, there's no need for this court to send it back for a remand for that finding. If the court disagrees that the correct remedy is to remand for a finding on that score, not just a good reverse, as my colleague on the other side suggested in their brief, maybe that's the case. This court may not remand because this question here would be unformed, even under the good faith exception. The question there is, would a reasonable officer have the objectively good faith belief that their action was constitutional? Here the answer is yes. Under this court's cases, and under Supreme Court's cases, officers are going to believe they're justified in making this remand. Correct. We take it to Leon. Leon himself said when courts disagree on whether a search is justified, that in itself is drawing evidence of good faith. And here officers have a lot of evidence that they believed justified their search, they knew that a person was part of a conspiracy, the conspirators had guns, that there were serious firearms, that the house might have firearms. Again, the house had evidence that it was being monitored by people inside, and they walked in the house and found somebody who they weren't expecting. But with some good faith, I mean, a lot of this discussion doesn't go to the fact of whether there was actual evidence, you know, that he actually did it. It's the consequences of our decision. That is a protective search, but one can get a warrant for taking it, but you choose to do a protective search. You say doing so and then going into a house that's been under surveillance for six hours and seeing someone there, then gives you a broader range of protective search. So move that beyond this specific criminal case, even though we're dealing with it, to what does it mean in the context when there's a warrant that can't be obtained. You go to someone's house, have it under surveillance, you see someone in there that you haven't seen before, you therefore can conduct a broad protective search on that alone. I don't think that's a fair statement of what we're saying here or the law. You know, these cases are less issues than fact-specific, context-dependent issues. So it's hard to give me a generalize. It is indeed, but the law that we articulate is not so specific to just this case. You want us to write a case that says, for this case only, these, in this particular case, and sometimes the courts bend to do that, but the general law that we would articulate would have to be established on the facts that are here on the record, and the facts being who got the warrant before, whether you would have, is one of the intention to view the independent source rule, but did not go into the house, and no one's offering any resistance. You didn't restrain the wife. You didn't restrain the single woman. You didn't do anything in there. The lawyer just didn't conduct the sweep, and to the extent of how does that not happen, well, it does not give a license to do that in any other case. I mean, once you may or may not have evidence of a warrant, and you choose instead to do a sweep of a house, and then you see somebody there, and then we now give you a license to conduct a broad sweep of the house. I don't think it's just that they saw someone in the house, but that's certainly indicative that there might be other people in the house that they weren't aware of. Well, like I said, this is a context-dependent inquiry, so what we have here is that we saw someone in the house, but they had been surveilling the house for about six hours, and so they knew that, despite the fact that our law surveillance and some of it we don't recognize, they also knew that Everett was part of a large group. So, okay, extend the facts. Just go and surveil that house for six hours, and if you go in there and see someone else, you then get the broad sweep. Well, the officers here also knew that Everett was part of a large-scale organization, that they were heavily armed, that Everett himself was heavily armed, that there could be armed guards in the house, there could be police. The license was warranted, but what about a protected sweep? Yeah, you know that. So someone who is involved in some type of activity outside of it, add that back to it. And the fact that you surveilled six hours, you see someone in the house, that's enough. I don't think it is, but I can't answer that question. I said it's enough. I mean, I'm talking into this case and how we want to articulate this case, what it is that differentiates this case from the instance in which that does happen. In other words, you have a situation that officers went to anybody's house, and then you see someone in a situation where you articulate, oh, this is dangerous. Someone could be upstairs. Somebody else could be in the house. Always, always a possibility, even if you don't see anybody in the house. Someone else could be in a two- or three-story house. And here, as I understand it, you searched his second floor. Where did he go to? Third floor. Correct. It is a three-story house. Then you had all three floors. The first floor wasn't searched because there are so many officers there. The bubbles are already staked there. So they only searched the top two floors. How many guns did they find? They found a number of guns, at least four by handgun. They were often close to his bed. There were a lot of firearms. Some of them were computers. If they had that, they wouldn't have known how many guns were up there. They wouldn't have known how many people were up there. Exactly right. They wouldn't have known there were guns up there. They wouldn't have known there were people up there. Here it's also complicated because there's always going to be a case. That's the reason why we're here. Correct. But the question is whether they should have gone up there. Here it's a little complicated, too, because this was being used as a sort of daycare. So officers also said in the special hearing, there might be kids up there. We didn't know. The reason they surveilled it for six hours is because they weren't really surveilling because they wanted to. They were waiting to see if all the parents are coming because they're kids. So officers were essentially worried that there might also be kids upstairs. Why wouldn't you get the warrant? I mean, that's additional evidence. You have enough evidence to get a search warrant. They didn't surveil it for six hours, and you didn't know there were kids in there. Why wouldn't you get a warrant? That's not clear from the record, Your Honor. I think once the officers knew that Everett wasn't the leader or right leader of the search warrant organization, their priority seemed to be to arrest him. And officers don't need to get into a more perverse route. We're going to see a few things that this woman has up to officer discretion. Does this record show who made the decisions, whether they were within the officer community or whether the prosecutors were involved in it or anything like that? There's testimony that it was the officers who made the decision, and it's not clear who were the supervising officers, not the officers who executed the warrant or executed the speech. Some of the evidence is the prosecuting attorneys. Not that I'm aware of. Can I ask you a brief question about the sentencing issue in this case? I don't have a lot of time, but I guess you can talk while I'm talking. So in your criminal record, we had a pretrial statement of one of his co-actors who indicated that this defendant should be responsible for up to 56 kilograms of cocaine. But in trial, he testified, I guess in support of the element of the offense, that he saw the defendant with about 5 kilograms of cocaine and then stopped there for whatever reason. I don't know why the prosecution didn't press him on that additional amount of cocaine. So you've got these two amounts, which on their face appear to be inconsistent, and the district court nonetheless relied on the co-conspirator's pretrial statement to increase the amount of drugs and therefore increase the amount of exposure for the defendant. At least on the face of it, I find that to be a little bit troubling. Tell me why that was okay. It's not like it didn't hurt him back. The co-conspirator simply said to the probation folks, this is the amount of cocaine. No other evidence in the record to contradict that. You have a different case. But that's not what we have here. So I slightly disagree that the evidence in the trial contradicts that. The prosecutor asked, did you see Everett with at least 5 kilograms of cocaine? He said yes. But Murray didn't say only 5, no more than that. And so his statements, pretrial statements, were consistent with the evidence at trial. They were consistent with his statements at trial and other evidence at trial. For example, Everett was seen with multiple kilograms of cocaine. And he thought she'd been Everett's friend without receiving multiple kilograms of cocaine. And that Everett's drug supply was a multi-kilogram supplier. And the district court here said it had seen Murray testify twice. And it found him very credible. And that's our credibility determination review for clear error. And in this court grant, district courts break that right down to other determinations. So I think I'm out of time for that. I think the testimony at trial and Murray's testimony, Murray's statements, your trial will all be consistent with your honor. Thank you very much. Court is adjourned. Pardon, Mr. Sun. May I please have the floor? Judge, can you answer your question? The arrest warrant was issued on the 17th. The district court made fact-finding based on the testimony of this person here. Was it the morning of the 17th? It was the morning of the 17th. So they had it when they got there around 1 o'clock. That's when they started their surveillance. Why didn't they get the warrant? They didn't think they had enough. The court could decide as part of the independent source exception that they did have enough. They didn't think they had enough. Detective Harden said it was what happened when we started the protective suite. And that can be considered, it wasn't offered by the defendant. That came out in the case in chief of the government. The government's direct examination, and Detective Harden just said it. But also, this did come out in the suppression group. This is J109. This is Officer Button, who was the occupant. Question. So after you had conducted this protective suite, based on the entire investigation, did you and other officers decide to apply for a search warrant? We did. So it does come up in the suppression here. And they had six and a half hours. They clearly didn't think they had enough. They had plenty of time. They could have gotten the warrant, but they didn't. What differentiates? That was the question. What differentiates this? Well, it's those facts. Those other facts that exist in all the cases I mentioned. They don't see movement. That comes up in cases. There's something going on, something in the window we see. Or we hear something. That can be an indication that there could be somebody else there. They don't have any of those facts. In Jones, Judge King, European, there were seven people there. Well, you know, that suggests that maybe there's somebody else there. Nothing like that here. There wasn't any information that, for example, this was a drug hangout or something where people go. Again, that's from Jones. There wasn't any uncertainty about how many people were there. That was information in the Loudenville case, again, from this court. So those facts are missing. Different points to the existence of surveillance cameras that might suggest someone could have been looking back at the officers and could have prepared possibly to respond if they entered the house. What about that? Two things. One, not able to come in, and they're downstairs. So there isn't any advance warning needed to know that the police are there. And, again, it goes back to lack of information. Well, there could be somebody there, but they don't have any specific articulable facts to think somebody is there. No reasonable belief that there is someone in the area to be swept who is a threat. There aren't any articulable facts that they can point to, and they don't try. We don't second-guess officers in rare cases and situations like this. In a case where, as you said, did they act reasonably? I think that maybe that's the standard. Did they act reasonably in this context in going to the second or third floor to conduct a sweep? Yeah, reasonably warranted in doing so, yes. But when there's testimony here that this was a common practice, that can detract from the deference that would normally be given to the police saying, well, we made this decision, that we thought it was necessary to protect. You don't have to say that it's a common practice that a warrant was taken out of context. It wasn't. I'm not going to argue that. That was their response to it. It was, and it came in response to their question. That was volunteered. It was direct testimony, not taken out of context. Why was it contested below that there was a question whether the officers would have, in fact, would have gotten search warrant? It's because the district court was put off half by the government saying that this was an inevitable discovery, not independent source. And so the only finding that the district court makes was there was sufficient information. What if I believe they would have gotten a search warrant in any event? What if I believe, reading this record, they would very definitely have gotten a search warrant? Should I disregard that and enter a religion? Because that's what happened leading up to the events of the 17th, particularly what happened on the 16th and all the information they got before the 16th. What if I from that conclude that they readily could have gotten a search warrant at the end of the search on the 16th? They could have gotten a search warrant for the great mass on the top two floors? If you conclude that they would have, based on the evidence that the government proved that, then that would establish the search. If that's what you concluded. But again, that's the government's word. They have to prove that, that they would have, and the testimony contradicts that. Thank you, Your Honor. Thank you, Mr. Sun. Mr. Sun, as Judge King indicated, you are a frequent flyer in our court, often volunteering to take court-appointed cases, and on behalf of the court, I want to thank you for once again ably representing Mr. Eppert in this matter. And the government also was ably represented by counsel, so thank you both. I had thought about trying to power through with the third case, but the coffee this morning suggests otherwise. So we're going to take a short recess and then move on to our final case. Before we do that, we'll go down and recount. So we'll take a brief recess.
judges: Albert Diaz, Robert B. King, James Andrew Wynn